IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| vs. : | Criminal No. 08-186 |
| : | |
| BURNIE MAJEED and KELVIN GANDY : | |

Legrome D. Davis, J.                                                                        August 4, 2009

MEMORANDUM

I.      THE DELAWARE RESIDENCE SEARCH WARRANTS[1]

    A.      BACKGROUND

Defendant Burnie Majeed ("Majeed") has moved to suppress all evidence obtained from the searches conducted at the residences located at 311 Watchgate Way in Townsend, Delaware, and 823 Cornstalk Drive in New Castle, Delaware. Majeed challenges the validity of the search warrants that authorized those searches by arguing that they were not adequately supported by probable cause because: 1) "[t]he conclusions reached by the [troopers in the affidavits were] based on assumptions, speculation, and conjecture" regarding the meaning of the intercepted conversations and therefore "cannot form the basis of probable cause"[2]; 2) the warrants do not provide the requisite nexus between criminal activity and the residences to be searched; and 3)

---

    [1] The applications for these search warrants did not contain any evidence obtained through Extensions 2 or 3 to wiretap warrant 32-3 (2006).

    [2] In his submissions, Majeed further argues that the evidence obtained from the search warrants must be suppressed "as fruit of the poisonous tree" because the warrants are based on intercepted conversations that were obtained from a wiretap that was improperly authorized. However that argument is now moot because, by way of separate order, we held that the wiretap warrants were valid.

1

the affidavits supporting the warrants do not establish that Majeed was taking part in ongoing criminal activity at the time the warrants were obtained.  (Def.'s 1st Supplemental Mot. Suppress 29.)  Majeed further asserts that, if the warrants are found to be invalid, the good faith exception to the exclusionary rule cannot apply because "the affidavit[s] in this case [are] so lacking in probable cause that good faith cannot be the basis for justifying the search."  (Id.)

    B.    DISCUSSION

        1.    The Validity of the Search Warrants

It is axiomatic that "a search warrant, supported by probable cause, is normally necessary before law enforcement may lawfully search a person's property."  United States v. Burton, 288 F.3d 91, 102 (3d Cir. 2002) (citing Payton v. New York, 445 U.S. 573, 586 (1980)).  An issuing judge may find probable cause when, "viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001).  In reviewing the issuing judge's determination, "we are to determine whether the [judge] had a 'substantial basis' for concluding that probable cause was present."  United States v. Ritter, 416 F.3d 256, 262 (3d Cir. 2005).  Under governing precedent, "[d]irect evidence linking the place to be searched to the crime is not required for the issuance of a search warrant."  Hodge, 246 F.3d at 305.  "Instead, probable cause can be, and often is, inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide' the fruits of his crime."  Id.  In determining whether there is sufficient probable cause to support the issuance of a warrant, a court "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of

offense." Id.

      Majeed argues that the warrant affidavits do not provide sufficient probable cause because they are based on interpretations of coded conversations by the troopers involved in the investigation.[3] He asserts that the troopers' interpretations "cannot form the basis of probable cause" because they are based "on assumptions, speculation, and conjecture." (Def.'s 1st Supplemental Mot. Suppress 29.) We disagree. The troopers' interpretations contained in the affidavits were based on their training and experience and their "expert[ise] in the fields of drugs and drug investigations." (Id. ¶ 71.) Courts have found that troopers' interpretations of coded conversations can support probable cause in obtaining a warrant. See United States v. Beltran, 11 Fed. App'x 786, 787 (9th Cir. 2001) ("We see no reason why the district court could not rely on [the agent's] interpretations [of intercepted conversations] to find probable cause."); United States v. Carr, No. 07-40034, 2007 U.S. Dist. LEXIS 56149, at *10 (D. Kan. July 31, 2007) (finding that "cryptic or coded conversations can support a finding of probable cause"); United States v. Feola, 651 F. Supp. 1068, 1096 (S.D.N.Y. 1987) (holding that the agents' interpretations "properly contributed to a finding of probable cause"). Even those courts that have expressed skepticism regarding heavy reliance on interpreted conversations have found that this is a "close question" and have acknowledged that interpreted conversations can support a finding of probable cause. See, e.g., United States v. Johnson, 4 Fed. App'x 169, 174 (4th Cir. 2001) (finding that "it is a close question whether the affidavit was sufficient to establish probable cause" where the affidavit supporting a warrant relied mostly on interpreted

---

      [3] The affidavits supporting both warrants are identical except for the paragraph describing the residence to be searched. Each affidavit recites all the evidence concerning both residences.

conversations).  In United States v. Cancelmo, for example, the Second Circuit Court of Appeals expressed skepticism about a warrant application that relied heavily on the interpretation of cryptic conversations.  64 F.3d at 808-09.  Although the Cancelmo decision did not rule on the sufficiency of probable cause, it did observe that the "agents' interpretation of the conversations arguably established probable cause, even in the absence of other corroborative facts."  Id. at 808.

We agree with the conclusion that a law enforcement officer's interpretations of intercepted conversations can form the basis of a finding of probable cause.[4]  In addition, we note that the issuing judge "was entitled to 'give considerable weight to the conclusions of this experienced law enforcement officer[] regarding where evidence of a crime [was] likely to be found.'"  Hodge, 246 F.3d at 307.  Turning to the case at hand, we find that the troopers' interpretations of the coded conversations constituted a proper basis for establishing probable cause.

Majeed next argues that the warrant affidavits fail to establish a nexus between the

---

[4]     While we have previously decided in this case that there are limits to the extent to which a trooper may interpret coded conversations as an expert witness at trial, the evidence that may be used to support a search warrant is much broader than the evidence that would be admissible at trial.  As the United States Supreme Court has noted:

> Trials are necessarily surrounded with evidentiary rules 'developed to safeguard men from dubious and unjust convictions.'. . .  But before the trial we deal only with probabilities that 'are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'

United States v. Harris, 403 U.S. 573, 582-83 (1971) (quoting Brinegar v. United States, 338 U.S. 160, 174-75 (1949)).

criminal activity and the searched residences. The Third Circuit Court of Appeals has consistently found that, in narcotics cases, "evidence . . . is likely to be found where the [drug] dealers reside." Burton, 288 F.3d at 103 (citing United States v. Whitner, 219 F.3d 289, 297 (3d Cir. 2000)). The rationale applied by the Third Circuit in so finding is that:

> [E]vidence associated with drug dealing needs to be stored somewhere, and . . . a dealer will have the opportunity to conceal it in his home. After all, a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold.

Whitner, 219 F.3d at 298. The application of this inference depends on a preliminary showing of evidence that supports the following premises:

> (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities.

Burton, 288 F.3d at 104.

First, the inference regarding Majeed's status as a drug trafficker is well supported by the troopers' interpretations of the intercepted conversations. (Id. ¶ 71.) The troopers concluded that many of Majeed's intercepted conversations signaled that he consistently engaged in drug trafficking activities. (See, e.g., id. ¶¶ 24, 30, 32, 34, 60.) In fact, the troopers concluded that the conversations evidenced that Majeed was a leader in his drug-trafficking organization. (Id. ¶ 29.)    Secondly, the affidavits for the search warrants provide sufficient evidence to support the conclusion that the subject residences are possessed by, or the domicile of, Majeed. Through

5

surveillance, the detectives determined that Majeed lived at 311 Watchgate Way in Townsend, Delaware, and spent many nights at his girlfriend's residence at 823 Cornstalk Drive in New Castle, Delaware. (Affs. ¶ 73.)  The affidavits state that, in several of the intercepted conversations, Majeed scheduled furniture and appliance deliveries to the Watchgate residence and made arrangements for the lawn care of that residence. (Id. ¶ 74.)  He also arranged to have his girlfriend do the walk-through inspection prior to moving to the Watchgate residence. (Id. ¶ 63.)  Furthermore, Majeed had keys and a garage door opener for the Cornstalk residence. (Id. ¶ 61.)  These observations provide sufficient grounds to believe that Majeed has possession of both residences.

Finally, the affidavits establish a sufficient link between the residences and Majeed's trafficking activities.  The affidavits detail several conversations that the troopers interpreted as indicating that Majeed received trafficking funds while he had possession of the two searched residences.  For example, on September 2, 2005, the troopers concluded that a member of Majeed's organization was bringing money from his drug-trafficking activities to the Cornstalk residence. (Id. ¶¶ 16-21.)  The affidavits also state that, based on the conversations that took place on November 3, 2006, between Majeed and Richard Pierce ("Pierce"), the troopers believed that Pierce agreed to give Majeed a car in payment for debts incurred from prior cocaine deliveries that Majeed made to Pierce. (Id. ¶ 52.)  Also on November 3, 2006, Majeed had a conversation with his alleged co-conspirator, Troy Cauthorn, in which Cauthorn asked Majeed what he wanted Cauthorn to do with the money that he had on him.  The affidavits state that this money was possibly related to the cocaine trafficking that Majeed and Cauthorn had been allegedly conducting in the weeks surrounding that conversation. (Id. ¶ 53.)  The affidavits

also state that, based on their expertise, the troopers believed that Majeed was using the two residences "to hide some of the proceeds of his cocaine trafficking operations." (Id. ¶ 76.)

Majeed argues that the affidavits do not show that criminal activity is ongoing because the alleged delivery of drug proceeds to the Cornstalk residence occurred fifteen months before the warrants were issued. (Def.'s 2nd Supplemental Mot. Suppress 3.) However, the troopers' interpretations of the conversations indicate that, as recently as approximately one month before the warrant was obtained, Majeed continued to receive proceeds from trafficking activities. (Affs. ¶ 52.) In addition, under governing precedent, "when an activity is of a protracted and continuous nature 'the passage of time becomes less significant.'" United States v. Tehfe, 722 F.2d 1114, 1119 (3d Cir. 1983) (quoting United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972)). Such "protracted and continuous activity is inherent in a large scale narcotics operation." Id. Therefore, we find that the affidavits presented sufficient evidence that Majeed continued to receive profits from drug trafficking around the time that the search was conducted. This evidence supports the inference that drug-related contraband would be found at the residences.

We find that the affidavits presented ample evidence to support the inferences that Majeed was a drug dealer, that he had possession of the residences, and that evidence was likely to be found at the residences. Accordingly, we hold that the issuing judge had a substantial basis for concluding that the affidavits provided sufficient probable cause to support the warrants.

    2.    The Good Faith Exception

Even if the warrants had not been sufficiently supported by probable cause, we would not suppress the evidence obtained because we find that the good faith exception clearly applies in

this case. Under the good faith exception to the exclusionary rule, "suppression of evidence 'is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority.'" United States v. Hodge, 246 F.3d 301, 307 (3d Cir. 2001). "To determine the applicability of the good faith exception to the exclusionary rule, we ask 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents, 307 F.3d 137, 145 (3d Cir. 2002). "The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." Hodge, 246 F.3d at 307-08 (citing United States v. Leon, 468 U.S. 897, 922 (1984)). However, the Third Circuit has identified four situations in which an officer's reliance on a warrant is not reasonable and therefore does not trigger the exception:

> (1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
> (2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;
> (3) when the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;' or
> (4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents, 307 F.3d at 146.

Here, Majeed argues that "the affidavit[s] in this case [are] so lacking in probable cause that good faith cannot be the basis for justifying the search." (Def.'s 1st Supplemental Mot. Suppress 29.) A warrant will fall within this situation if it contains only a "bare bones" affidavit. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents, 307 F.3d at

8

147. The Third Circuit Court of Appeals has explained that such a situation is rarely found:

> We have identified very few situations in which an affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' These include affidavits based on conclusory assertions, a single piece of outdated evidence, or an uncorroborated or unreliable anonymous tip.

United States v. Sarraga-Solana, 263 Fed. App'x 227, 232 (3d Cir. 2008) (collecting authority). Here, the affidavits contained a large number of conversations involving Majeed that experienced troopers, who are described as "experts in the fields of drugs and drug investigations," (Affs. at ¶ 72), interpreted as indicating that Majeed was involved in drug trafficking activities and was receiving proceeds from those activities as recently as approximately one month before the warrants were issued. They further concluded, based on their training and experience, that Majeed was likely to keep drug proceeds and other contraband in his home, an assumption which is supported by this circuit's precedent. See Whitner, 219 F.3d at 297. Although much of the evidence in the warrant comes from interpreted conversations, as we explained above, courts have consistently found that interpreted conversations can support probable cause. See Beltran, 11 Fed. App'x at 787; Feola, 651 F. Supp. at 1096. In fact, even in cases where there is a very heavy reliance on interpreted conversations to establish probable cause, courts have found that such cases pose "close questions" of law. See Cancelmo, 64 F.3d at 808-09; Johnson, 4 Fed. App'x at 174. Here, the interpretations of the conversations provide sufficient probable cause to support the warrant. It is unreasonable to expect an officer to resolve the close legal question of whether it was permissible for the issuing judge to rely on the troopers' interpretations to find probable cause. As such, he could not have been expected to independently conclude "that the search was illegal

despite the [issuing judge's] authorization." See Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents, 307 F.3d at 145.  Accordingly, we find that, even if the warrant had not been adequately supported by probable cause, the good faith exception would clearly preclude suppression of the evidence obtained through the warrants.

II.     THE BANK ACCOUNT WARRANTS[5]

Majeed seeks suppression of all evidence obtained through warrants authorizing the search of his and his parents' accounts and records at Bank of America and Wachovia Bank ("the bank warrants").  In evaluating the bank warrants, we need not reach the question of probable cause because we find that the good faith exception to the exclusionary rule clearly applies to the execution of these warrants.  "[I]f a motion to suppress evidence obtained pursuant to a warrant does not present a Fourth Amendment argument that should be decided in order to provide instruction to law enforcement or to magistrate judges, it is appropriate for a reviewing court to turn 'immediately to a consideration of the officers' good faith.'"  Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents, 307 F.3d at 145.  The only Fourth Amendment question in Majeed's Motion to Suppress that could potentially be described as one that "should be decided in order to provide instruction" is the question of whether the issuing judge may rely on troopers' interpretations of intercepted conversations to find probable cause.  We will not address that issue here because we have already addressed that specific question in our discussion of the Delaware residence search warrants and have found that the troopers' interpretations can support a finding of probable cause.  The reasoning behind that

---

[5]     In reviewing these warrants, we do not take into account any evidence obtained through Extensions 2 or 3 of wiretap warrant 32-3 (2006).

finding applies equally to the bank warrants because the corresponding affidavits are based on trooper interpretations that are substantially the same as those discussed in the Delaware warrants. Accordingly, we will proceed directly to the analysis of the good faith exception's applicability to these warrants.

In his challenge to the bank warrants, Majeed argues that the good faith exception should not apply because the affidavits are "so lacking in probable cause that good faith cannot be the basis for justifying the search[es]." (Def.'s 1st Supplemental Mot. Suppress 29.) As discussed above, the "so lacking" standard is met when a warrant is supported only by a "bare bones" affidavit. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents, 307 F.3d at 147. The Third Circuit has found the "so lacking" situation to apply in cases where, for example, the supporting affidavit is based "on conclusory assertions, a single piece of outdated evidence, or an uncorroborated or unreliable anonymous tip." Sarraga-Solana, 263 Fed. App'x at 232. We find that the affidavits supporting the bank warrants clearly do not fall into the "so lacking" category.

Our careful review of the bank warrant affidavits revealed several pieces of evidence that support a finding of probable cause to search the bank accounts of Majeed and his parents. In particular, the affidavits provide evidence to support the inference that Majeed is receiving funds from drug trafficking and is otherwise unemployed.[6] They further show that Majeed keeps

---

[6] In establishing that Majeed is involved in drug trafficking activities, the affidavits detail many conversations which the troopers interpret as referring to Majeed's cocaine sales (see, e.g., Bank of Am. Aff. & Wachovia Aff. 159-60, 175), Majeed's thoughts about potentially stopping his drug trafficking business in the future, (id. at 361-63), and Majeed's plans to evade the police, (id. at 372-77). The affidavits also state that, according to the troopers' interpretations, Majeed was receiving payments from drug trafficking operations in the months before the warrants were sought. (See, e.g., id. at 203, 345.) Although this evidence is based largely on the troopers' interpretations of intercepted conversations, as we explained above, such

"sizable deposits" in his bank accounts.⁷  Additionally, they show that Majeed's mother is in charge of managing and keeping some of Majeed's money, and that Majeed's father helps transfer money between Majeed and his mother.⁸  We find that this evidence supports the inference that Majeed's bank accounts and those of his parents may have contained evidence related to proceeds derived from Majeed's drug-trafficking activities.

In finding probable cause to search the bank accounts of a suspected drug trafficker's family members, courts have found that, where there is some evidence that the defendant used his family's bank accounts to hide drug proceeds, that evidence supports a finding of probable cause to search those accounts.  See, e.g., United States v. Santiago, 227 F.3d 902, 907 (7th Cir. 2000).  Although in this case the evidence of that practice is based largely on the conclusions of the affiants, those conclusions can contribute to establishing probable cause.  See United States v. Schultz, 14 F.3d 1093, 1097-98 (6th Cir. 1994).  Even courts that have found that an affiants'

---

interpretations can adequately support a finding of probable cause.  See, e.g., Beltran, 11 Fed. App'x at 787; Feola, 651 F. Supp. at 1096.  In addition, the affidavits note that "[t]hroughout the course of the investigation, [the] affiants, through the assistance of surveillance units, have noted that Majeed has never gone to any type of legitimate job."  (Id. at 387.)

⁷  The troopers intercepted a conversation between Majeed and a Wachovia employee in which the two discussed Majeed's several Wachovia bank accounts, including a checking account with a balance of $28,000.  (Id. at 385.)

⁸  The troopers further state in the affidavit that they "believe that money generated by [Majeed's] cocaine trafficking ventures is being funneled through accounts managed by his mother . . . and his father."  (Bank of America Aff. & Wachovia Aff. at 389.)  The affidavits explain that Majeed's mother "plays a trusted role in Majeed's life by managing his money."  (Id. at 383.)  They cite conversations from which the troopers determined that Majeed's mother managed his credit card bill, received rent money from properties belonging to Majeed, and gave Majeed his own money whenever he requested it.  (Id. at 383-89.)  The affidavits also showed that Majeed did not know how to retrieve money from one of his bank accounts and had to ask his mother for assistance in doing so.  (Id. at 385.)  The affidavits also showed that Majeed spoke to his father about financial issues, (see id. at 383, 361-63), and that Majeed gave his father rent profits to be given to Majeed's mother, (see id. at 384).

conclusions are not enough, without more, to establish probable cause have found that those conclusions are sufficient to trigger the good faith exception to the exclusionary rule.  Id. at 1098.  In United States v. Schultz, for example, a warrant to search a safety deposit box of a suspected drug trafficker was issued based largely on the affiant's statement that "[b]ased on his training and experience, [he] believed . . . that it is not uncommon for the records, etc. of such [drug] distribution to be maintained in bank safe deposit boxes."  Id. at 1097.  The Schultz court found that, although the affiant's statement was not sufficient to establish probable cause, the good faith exception applied because "the connection was not so remote as to trip on the 'so lacking' hurdle."  Id. at 1098.

In the present case, we find that the affidavits do contain evidence that supports the inference that evidence was likely to be found in the bank accounts.  Furthermore, like the court in Schultz, we find that the affiants' conclusions regarding the bank accounts' connection to Majeed's trafficking activities were certainly not "so remote" that they made the affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  Id. at 1098.  Accordingly, we find that the warrants fall well within the good faith exception to the exclusionary rule.

III.   THE GANDY RESIDENCE SEARCH WARRANTS[9]

Defendant Kelvin Gandy moves to suppress the evidence obtained through the search of the residences located at 2812 West Second Street in Chester, Pennsylvania (the "Chester residence"), 1201 Lincoln Avenue, Apartment 8, in Prospect Park, Pennsylvania (the "Prospect

---

[9] The applications for these search warrants did not contain any evidence obtained through Extensions 2 or 3 to wiretap warrant 32-3 (2006).

Park residence"), and 4103 Hamilton Road, Apartment 2621, in Vorhees, New Jersey[10] (the "Vorhees residence") (collectively, the "Gandy residence warrants"). The Government has indicated that it will not seek to introduce evidence from the Chester residence. Therefore this Order will address only the warrants for the Prospect Park residence and the Vorhees residence. If the Government does intend to seek the introduction of any evidence obtained at the Chester residence, it must advise this Court of that fact within three days of the issuance of this Order.

At the outset we note that Gandy's motion to suppress does not raise any issues "that should be decided in order to provide instruction to law enforcement or to magistrate judges" other than those that we have previously resolved in this Order. See United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents, 307 F.3d 137 at 145. Accordingly, we will restrict our analysis to the issue of whether the good faith exception to the exclusionary rule applies in this case. Id. at 145.

As we explained above, there are four situations in which the Third Circuit has found that the good faith exception to the exclusionary rule will not apply:

> (1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
> (2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;
> (3) when the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;' or
> (4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents, 307 F.3d at 146.

---

[10] Gandy's Motion lists the Vorhees residence address as 327 Hancock Street, Apartment 2621, Vorhees, New Jersey. (Gandy's Mot. Suppress ¶ 44, 51.) However, the search warrant and the property record for the warrant list the address as 4103 Hamilton Drive, Building 2600, Apartment 2621, Vorhees, New Jersey.

14

In his Motion to Suppress, Gandy appears to indicate that he believes that the first situation above applies, namely that the affidavits contained a false statement.[11] The Motion states:

> Gandy will establish that he never received mail at [the Vorhees residence] . . . . Information to the contrary in the affidavit[s] is false. Petitioner will make a substantial preliminary showing that a false statement, knowingly and intentionally and with reckless disregard for the truth, was included in the affidavit[s] and that the allegedly false statement is necessary to the finding of probable cause.

(Gandy's Mot. Suppress ¶ 51.)

A careful review of the affidavits reveals that this argument is clearly incorrect. The affidavits make no reference to Gandy receiving mail at the Vorhees residence. Instead, the affidavits state that the person who received mail at that residence goes by the name of R. Nichols. The affiants believe this person to be the Rahneesha Sherie Nichols who also lives at the Prospect Park residence. (Vorhees & Prospect Park Affs. 83, 85.) The affidavits state:

> The Postal Office advises that as of today's date . . . the individual that received mail at 4103 Hamilton Drive, Building 2600, Apt. 2621 in Vorhees, New Jersey, was R. Nichols. Your affiants know that this is the same individual who resides at the apartment in Prospect Park, Pa.

(Id. at 83.) The affidavits make no other reference to anyone else receiving mail at that or any other location. Accordingly, we find that the affidavits contain no false information stating that Gandy received mail at the Vorhees location. We therefore reject Gandy's argument on this issue.

Gandy's Motion also states that "there was not a fair probability that items related to the

---

[11] The affidavits for both warrants are identical except for the paragraph that describes the residence to be searched.

distribution of narcotics would be found inside the houses." (Gandy's Mot. Suppress ¶ 47.) Gandy essentially argues that the warrants were not supported by probable cause. (See id. ¶ 50.) Because our present task is to determine whether the good faith exception to the exclusionary rule applies, we ask whether the affidavits are "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents, 307 F.3d at 146. Here, we find that the affidavits did contain evidence that supported a finding of probable cause. As we explained above, the Third Circuit Court of Appeals has consistently found that, in narcotics cases, "evidence . . . is likely to be found where the [drug] dealers reside." United States v. Burton, 288 F.3d 91, 104 (3d Cir. 2002) (citing United States v. Whitner, 219 F.3d 289, 297 (3d Cir. 2000)). The application of that inference depends on evidence supporting the following premises:

> (1) that the person suspected of drug dealing is actually a drug dealer;
> (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities.

Id. at 104. We find that the affidavits contained evidence supporting each of these premises. Although the evidence supporting this inference is largely based on the affiants' interpretations of intercepted conversations, for the reasons we explained in our discussion of the search warrants for Majeed's residences, we find that such interpretations can support a finding of probable cause. See United States v. Beltran, 11 Fed. App'x 786, 787 (9th Cir. 2001); United States v. Feola, 651 F. Supp. 1068, 1096 (S.D.N.Y. 1987).

To support the inference that Gandy is a drug-trafficker, the affidavits contain numerous examples of situations in which, through the interpretation of intercepted conversations and

16

surveillance, the troopers determined that Gandy was taking part in drug-trafficking activities. The activities included, among others, delivering cocaine to a person named Adrian Reed, (Aff. at 16-20 (1/6/06-1/9/06)), accompanying Majeed to obtain cocaine from one of his suppliers, (id. at 25-26 (1/15/06)), receiving cocaine from Cauthorn, (id. at 68-69 (8/21/06)), and discussing with Majeed ways to ensure that their drug-trafficking activities would not be discovered by the police, (id. at 76-81 (11/22/06)).

In addition, the troopers' surveillance revealed that Gandy had access to and was often located at both residences and, on at least two occasions, returned to those residences following the completion of drug-related activities. (See, e.g., id. at 25 (1/15/06), 68-69 (8/21/06).) Furthermore, the affidavits show that the two residences are connected through Rahneesha Nichols. Nichols is the person who receives mail at the Vorhees address, and she is the same person who registered the Oldsmobile Alero, which Gandy operated during the investigation, using the Prospect Park address. (Id. at 83, 85.) The affidavits state that, based on the investigation, the affiants believe that Gandy is employing both residences "to facilitate his cocaine trafficking efforts" and that he is using the Vorhees residence as his primary residence. (Id. at 85-86.)

Also, the affidavits show a connection between the residences and Gandy's alleged trafficking activities. For example, they demonstrate that following a transaction in which the troopers believe Gandy received cocaine from Cauthorn, he returned immediately to the Prospect Park residence. (Id. at 68-69 (8/21/06).) On another occasion, Gandy returned immediately to the Vorhees residence after accompanying Majeed on what troopers believe to be a visit to Majeed's suppliers. (Id. at 25 (1/15/06).) The fact that Gandy returned directly to these

residences immediately after apparently engaging in trafficking-related activities lends credence to the troopers' belief that contraband was likely to be found at those residences.

We find that the affidavits provide evidence that supports the inference that drug-trafficking evidence was likely to be found at both residences.  We therefore do not believe that the affidavits supporting the Gandy residence warrants was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents, 307 F.3d at 146.  Because we find that the good faith exception to the exclusionary rule clearly applies to the warrants used to search Gandy's residences, we will deny Gandy's motion to suppress the evidence obtained from those warrants.

An appropriate order follows.